WO                        IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

JEFFREY A. STILLMAN,                    )
                                        )
                        Plaintiff,      )
                                        )
        vs.                             )
                                        )
COLUMN5 CONSULTING, L.L.C., et. al,     )
                                        )        No. 3:14-cv-8207-HRH
                        Defendants.     )        (Prescott Division)
_____ )

O R D E R

Motion for Summary Judgment

Defendant moves for summary judgment.[1] This motion is opposed.[2] Oral argument

was requested and has been heard.

Facts

Plaintiff is Jeffrey A. Stillman.  Defendant is Column5 Consulting, L.L.C.

Defendant is a consulting firm that assists clients with enterprise performance

management software implementation.  The development and delivery of software training

to clients' employees is one of the services provided by defendant.

_____

[1]Docket No. 36.

[2]Docket No. 38.

-1-

On August 2, 2010, plaintiff was hired by defendant to be an enterprise performance management curriculum developer and trainer.  Plaintiff was an "at will" employee. Jennifer Harlan was plaintiff's supervisor throughout his employment with defendant. Plaintiff testified that "for the majority" of his time working for defendant, his relationship with Harlan was "exceptional" and that "she enjoyed the fact that I have very IT technical background."[3]

In early 2012, plaintiff was directed to develop training materials for NBCU employees in Los Angeles and New York.  Plaintiff presented the Los Angeles training sessions on April 9, 10, and 13, 2012.

On April 13, 2012, Richard Winter, an NBCU employee, advised Scott Kolka and Adam Schulang, two of defendant's employees, that plaintiff had

> not do[ne] a particularly good job of presenting.  Paul Mahal and I had only intended to drop in for a couple minutes, but ended up spending the entire day with the group – effectively, taking over the class.  Given that the upcoming N.Y. training sessions will have a more demanding audience and Paul and I will not be in attendance, I am very concerned.  At a minimum, Adam needs to sit in on these sessions.  Perhaps, he should be doing the presenting.[4]

---

[3]Deposition of Jeffrey Alan Stillman at 32:19-24, Exhibit C, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[4]Email from Richard Winter to Scott Kolka and Adam Schulang, Exhibit F, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

Harlan avers that she "did not learn of [this] email" until years later,[5] even though Harlan

testified that she interacted with Kolka and Schulang "all the time."[6]

On April 16, 2012, plaintiff reported to Jonathan Pause, another employee of

defendant's, that the Los Angeles training "went very well.  Everything went smooth....

The Tuesday group was more lively, asked a lot of good questions."[7]  Plaintiff's average

instructor performance rating from the Los Angeles NBCU training was 4.45/5 for the April

9-10 training and 4.02/5 for the April 13 training.[8]

Plaintiff also told Pause that

> NBCU has an employee named Paul, who is very knowledge-
> able in BPC, and has 'inserted' himself in the training.  I'm not
> sure how he formed the opinion that I needed help but he took
> it upon himself to pretty much take over the class about half
> way through.  I've conferred with Diane [NBCU New York
> employee] and we've got the content nailed down for this
> week and I don't foresee any issues in delivering it, so having
> anyone join us for the training is not required, as far as I'm

---

[5]Affidavit of Jennifer Harlan at ¶ 4, Exhibit Q, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[6]Deposition of Jennifer Harlan at 29:11-21, Exhibit I, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[7]Email from Jeff Stillman to Jonathan Pause, Exhibit E at 1, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[8]Exhibits C and D, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

concerned.[9]

Plaintiff also emailed Harlan on April 16, 2012 and advised her that he

> [h]ad a great discussion with Diane from NBCU-TVs. She suggested opening with a showing what a BPC report looks like and how it functions – to show the capabilities of BPC and what it will do for them. She also mentioned that they liked the reporting content that their admin, Paul, did at the end of class. I let her know that I am prepared and happy to deliver that content for them. She volunteered to rearrange some slides in the presentation deck[10] to meet what she was suggesting and we'll meet and go over the changes at 5pm Eastern.[11]

Harlan avers that plaintiff "did not explain that an NBCU employee essentially took over the class...."[12] Plaintiff disputes that Mahal "essentially took over the class." Plaintiff testified that Mahal

> approached me before the first day of class, essentially assert-

---

[9]Email from Jeff Stillman to Jonathan Pause, Exhibit E at 1, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[10]Plaintiff had sent a working draft of the presentation deck to Smykowski in March, at which time she advised that she had some "updates" that she wanted to add. Exhibit J, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39. Plaintiff emailed Harlan to ask how to respond politely to Smykowski's request, stating that "[a]t this point, I've finished developing the PPT deck and user manual, so perhaps if she wants to update them, it's not an issue, unless I'm missing something." Id.

[11]Email from Jeff Stillman to Jennifer Harlan, Exhibit I, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[12]Harlan Affidavit at ¶ 3, Exhibit Q, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

> ing himself that, after I finished my presentation, he was going
> to then present the BPC reporting suite or teach them about
> BPC reporting.  And from my perspective, that was not in the
> agreed-upon scope of the curriculum and therefore it was not
> my concern.  What he wanted to do with his co-workers was
> his business.[13]

For each of the three Los Angeles training days, plaintiff reported working eight

hours on his billing sheet; however, plaintiff only worked six hours on April 10, 2012.

Plaintiff testified that he left early because "[t]he content of my delivery was complete."[14]

Plaintiff testified that he may have completed his billing sheet before he finished his travel

and that he could not revise his billing sheet once it was submitted.[15]  But, he testified that

he supposed that he could have contacted someone in accounting to make the adjustment.[16]

On April 17, 2012, Harlan learned from accounting that plaintiff had incurred a

change fee for his return airline ticket.  Harlan spoke to plaintiff about the change fee and

he told her he left the training early.  Harlan instructed plaintiff that in the future he should

not "leave the client site before 5pm unless class is completely over and no remaining

attendees are working with BPC" and that he should "not incur change fees for earlier

---

[13]Stillman Deposition at 118:14-22, Exhibit A, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[14]Stillman Deposition at 101:10, Exhibit C, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[15]Id. at 101:23-102:3.

[16]Id. at 102:4-7.

flights home...."[17]   Harlan avers, however, that plaintiff "did not explain that an NBCU employee essentially took over the class when we discussed why he left the NBCU site early."[18]

Plaintiff presented the NBCU training in New York on April 18-19, 2012.  Plaintiff's average instructor performance rating for this training was 4.02/5.[19]

In July 2012, defendant sent plaintiff to the Philippines to conduct training.  On July 18, 2012, plaintiff reported to Harlan that "[t]he training is going very well."[20]  On July 20, 2012, plaintiff advised Harlan that he was "thinking I should pick up the pace to keep [the trainees] engaged" because of their experience level.[21]

On July 21, 2012, plaintiff experienced a panic attack.  Plaintiff testified that this was the first time he had ever experienced a panic attack.[22]  Plaintiff then had a Skype conversation with  Harlan during which he told her he was either suffering from anxiety

---

[17]April 17, 2012 email from Jennifer Harlan to Jeff Stillman, Exhibit H, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[18]Harlan Affidavit at   3, Exhibit Q, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[19]Exhibit E, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[20]Email from Jeff Stillman to Jennifer Harlan, Exhibit K at 2, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[21]Id. at 1.

[22]Stillman Deposition at 23:1-8, Exhibit C, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

or depression and that he could not continue to conduct the training.[23]

Plaintiff had a prior history of depression.  He testified that he was first diagnosed with depression in the early 1990s.[24]  Plaintiff testified that he received counseling and took Prozac for about year.[25]  He testified that he was able to continue functioning in his life activities at that time.[26]  Plaintiff testified that he had a second episode of depression in 1994 and that he received counseling for about six months but was not put on any medication.[27] Plaintiff testified that he was able to continue functioning in his life activities during this depressive episode although "[i]t was actually noticed at work, but I was given a little bit of consideration, having worked there for a while."[28]  Plaintiff testified that he had a third episode of depression in late 1999 and that he received counseling and was put on Zoloft for about six months.[29]  Plaintiff testified that he was able to continue functioning in his life

---

[23]Id. at 29:25-30:13.

[24]Id. at 40:19-23.

[25]Id. at 42:7-16.

[26]Id. at 42:20-22.

[27]Id. at 43:3-44:5.

[28]Id. at 44:10-14.

[29]Id. at 44:22-45:25.

activities during this third depressive episode.[30]   During one of these three episodes of depression, plaintiff endorsed suicide ideation.[31]   Plaintiff also testified that he was diagnosed with seasonal affective disorder in 2010, that he received counseling and was prescribed Zoloft, but that the disorder resolved in 2011 when he moved to Arizona.[32]

Plaintiff avers that when he is suffering from one or more of his disorders (depression, anxiety, or panic disorder) he "cannot think clearly, concentrate, interact with other people, sleep, eat, or travel."[33]   Plaintiff avers that during an episode of depression, he has "fatigue, uncontrollable crying, inability to think clearly or concentrate, and inability to properly interact with other people."[34]   Plaintiff avers that he has the following symptoms during an anxiety or panic attack: "nausea, lack of appetite, insomnia, extreme discomfort traveling, inability to think clearly or concentrate, and inability to properly interact with other people."[35]   He avers that these were the symptoms that "occurred

---

[30]Id. at 46:6-14.

[31]Stillman Deposition at 69:7-23, Exhibit A, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[32]Stillman Deposition at 47:2-48:18, Exhibit C, Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[33]Declaration of Jeffrey Stillman at 3-4, ¶ 15, Exhibit B, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[34]Id. at 4, ¶ 16.

[35]Id. at ¶ 17.

during my Philippines training."[36]

Because of the panic attack, plaintiff left the Philippines after completing the training that was scheduled for July 23, 2012. Upon his return to Arizona, plaintiff sought medical care on July 24, 2012. Plaintiff's doctor diagnosed depression, anxiety and panic; started him on medications; and recommended that he could return to work on July 30, 2012 without restrictions.[37] Plaintiff emailed the doctor's report to Harlan on July 24, 2012.[38] Plaintiff also had a discussion with Harlan on July 24, 2012, during which time he "asked her to accommodate me by not assigning me a job that required travel for about a month because my medication takes four to six weeks for it to become fully effective."[39] Harlan advised that the doctor's report did not include any such restriction and that plaintiff would need to provide medical certification supporting the travel restriction. Plaintiff also testified that Harlan stated "that she didn't know I suffered from depression when she hired me."[40]

---

[36]Id.

[37]Doctor's Report of Work Status and Restrictions at 1, Exhibit L, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[38]Email from Jeff Stillman to Jennifer Harlan, Exhibit N, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[39]Stillman Deposition at 60:9-13, Exhibit C, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[40]Id. at 151:1-3.

On July 30, 2012, David Den Boer, defendant's founder, met with Smykowski in New York.  Den Boer testified that Smykowski told him that the April 2012 NBCU New York training had been "very poor...."[41]  Den Boer instructed Harlan to call Smykowski to follow up.

On August 2, 2012, plaintiff obtained medical certification supporting the travel restriction but plaintiff decided to wait to give it to Harlan on August 7, 2012, when he had a meeting scheduled with her.[42]  Plaintiff did not, however, meet with Harlan on August 7, 2012 because she rescheduled the meeting.

On August 7, 2012, Harlan spoke with Smykowski, who shared her concerns about the April 2012 New York training.[43]  In a January, 9, 2013 email, Smykowski outlined the concerns that she had shared with Harlan:

> ●   The Training was conducted by someone who had not previously been involved in the implementation of the project.  The trainer had no hands-on knowledge of the project, our business, how we would be using the system, etc.
> ●   Prior to the training the Trainer sent me the materials he would be using during the sessions.  The deck was a

---

[41]Deposition of David Den Boer at 26:25-27:1, Exhibit A, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[42]Stillman Declaration at 2, ¶ 7, Exhibit B, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[43]Harlan Deposition at 60:8-14, Exhibit G, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

> "canned" deck updated for the specifics of our business, but would not have been clear or relevant enough to use as it [was]. I reworked the deck and we used that version.
>
> - The trainer was not effective during the actual training sessions. He did not have command of the room and while he may have had knowledge of the BPC system, this did not come across to the audience. During the LA training NBCU IT employees stepped in and took over the training and in NYC I handled the majority of the session. He was not a good fit to train our experienced Finance team.[44]

Harlan avers that plaintiff "did not inform me that Ms. Smykowski made major revisions to his ... training materials. I was not aware until August 2012 when Ms. Smykowski informed me of her revisions. After speaking with Ms. Smykowski in August 2012 I concluded that [plaintiff] had purposefully underplayed the extent of her modifications to keep that information from me as his supervisor."[45] Harlan also avers that after she spoke with Smykowski, she "reviewed the evaluations provided to me from Mr. Stillman that he claimed were created by the NBCU employee-attendees of the Los Angeles and New York training sessions. I found the evaluations to be inconsistent with the

---

[44]Email from Diane Smykowski to Jennifer Harlan, Exhibit J, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[45]Harlan Affidavit at ¶ 6, Exhibit Q, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

negative report given to me by Ms. Smykowski."[46]

Stillman avers, however, that the evaluations he submitted were "completed by the class participants.  I did not fill out any of them."[47]

Harlan terminated plaintiff on August 10, 2012.  She avers that she "made the final decision to terminate [plaintiff's] employment" on August 9, 2012.[48]  Harlan avers that she

> felt I had no choice but to terminate [plaintiff's] employment in August 2012 after learning for the first time of the extent of his failure to develop and deliver adequate training to NBCU, both because I believed he purposefully withheld that information from me in April 2012 and because I was concerned he may have fabricated the NBCU attendee evaluations as an additional means of hiding the adequacy of his training efforts.[[49]]

Harlan avers that she terminated plaintiff "because I lost confidence in his ability to develop and deliver custom training that adequately met our client's needs and because I no longer trusted [him] to be honest and forthcoming."[50]  Harlan avers that she did not consider plaintiff's mental health issues when she was deciding whether to terminate his

---

[46]Id. at ¶ 8.

[47]Stillman Declaration at 2, ¶ 5, Exhibit B, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

[48]Harlan Affidavit at 2, ¶ 9, Exhibit Q, Defendant Column5 Consulting, L.L.C.'s Statement of Facts [etc.], Docket No. 37.

[49]Id. at ¶ 10.

[50]Id. at ¶ 12.

employment.[51]

After he was terminated, plaintiff drove to Illinois on August 11, 2012 to stay with friends.  After being there for several days, plaintiff had a panic attack and could not stop crying.  He voluntarily checked into the V.A. Medical Center on August 17, 2012, where he was monitored for suicide ideation.  He was discharged on August 22, 2012.

On October 24, 2014, plaintiff commenced this action.  Plaintiff's complaint contains two counts.  In Count I, plaintiff asserts three American with Disabilities (ADA) claims:  1) a failure to accommodate, 2) unlawful termination, and 3) retaliation.  In Count II, plaintiff asserts a claim for declaratory relief that defendant violated the ADA by failing to provide a reasonable accommodation, by unlawfully terminating him, and by retaliating against him.

Defendant now moves for summary judgment on all of plaintiff's claims.

## Discussion

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The initial burden is on the moving party to show that there is an absence of genuine issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the moving party meets its initial burden, then the non-moving party must set forth specific facts showing that there

---

[51]Id. at ¶ 11.

-13-

is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  In deciding a motion for summary judgment, the court views the evidence of the non-movant in the light most favorable to that party, and all justifiable inferences are also to be drawn in its favor.  Id. at 255.  "[T]he court's ultimate inquiry is to determine whether the 'specific facts' set forth by the nonmoving party, coupled with undisputed background or contextual facts, are such that a rational or reasonable jury might return a verdict in its favor based on that evidence."  T.W. Elec. Service, Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 631 (9th Cir. 1987).

"The ADA forbids discrimination in employment on the basis of disability, requires employers to reasonably accommodate their employees' disabilities, and prohibits retaliation against those who oppose acts prohibited by the ADA."  Stiefel v. Bechtel Corp., 624 F.3d 1240, 1242 (9th Cir. 2010).  Plaintiff alleges that defendant violated each of these directives.

To establish a prima facie case for failure to accommodate under the ADA, plaintiff must show that "(1) he is disabled within the meaning of the ADA; (2) he is a qualified individual able to perform the essential functions of the job with reasonable accommodation; and (3) he suffered an adverse employment action because of his disability."  Allen v. Pacific Bell, 348 F.3d 1113, 1114 (9th Cir. 2003).  "An unlawful discharge claim under the ADA is often, 'from a practical standpoint,' the same as a failure to accommodate claim

because the consequence of the failure to accommodate is frequently an unlawful termination." Hoang v. Wells Fargo Bank, N.A., 724 F. Supp. 2d 1094, 1102 (D. Or. 2010) (quoting Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1139 (9th Cir. 2001)). "The Ninth Circuit analyzes ADA cases using the burden-shifting analysis from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Id. "Under McDonnell Douglas, once plaintiff establishes a prima facie case, the burden shifts to defendant to provide a non-discriminatory reason for the adverse employment action." Id. at 1102-03. "If defendant does so, plaintiff bears the burden of showing defendant's reason was a pretext for discrimination." Id. at 1103.

Defendant first argues that plaintiff cannot establish that he is disabled within the meaning of the ADA. To determine whether plaintiff's condition constitutes a disability under the ADA, the court must first "determine whether the plaintiff has an ADA recognized 'impairment.'" Wong v. Regents of Univ. of Calif., 410 F.3d 1052, 1069 (9th Cir. 2005). Second, the court considers whether "the life activities from which [plaintiff] was impaired ... amounted to major life activities[.]" Gribben v. United Parcel Service, Inc., 528 F.3d 1166, 1169 (9th Cir. 2008). Third, the court considers whether plaintiff's "impairment substantially limited him from performing the identified major life activities." Id.

Defendant argues that plaintiff's mental impairments are not ADA recognized impairments because they are temporary conditions. "It is well-established that temporary

-15-

conditions generally are not considered disabilities." Baker v. Roman Catholic Archdiocese of San Diego, Case No. 14cv800 JM (JMA), 2014 WL 4244071, at *4 (S.D. Cal. Aug. 26, 2014); see also Sanders v. Arneson Products, Inc., 91 F.3d 1351, 1354 (9th Cir. 1996) (holding that a psychological condition that lasted for less than four months was a temporary condition and not a disability under the ADA). Defendant argues that plaintiff had one panic attack, which resulted in anxiety and depression, which lasted only a short period of time, as evidenced by the fact that plaintiff was able to go back to work approximately one week after first being treated for the panic attack and resulting impairments.

Defendant's argument, however, ignores the fact that plaintiff suffers from more than a panic disorder. Plaintiff also suffers from depression, and plaintiff's depression is not a temporary condition. Rather, it was episodic, and impairments that are episodic can still be considered a disability under the ADA if the condition "would substantially limit a major life activity when active." 42 U.S.C. § 12102(4)(D). Thus, it is at least possible that plaintiff's depression could be considered an ADA recognized impairment.

But even if plaintiff had a mental impairment that was a recognized ADA impairment, defendant argues that plaintiff is still not disabled for purposes of the ADA because his depression, anxiety, and panic disorder did not substantially limit his major life activities. Major life activities "include 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning,

-16-

reading, concentrating, thinking, communicating, and working.'"   Weaving v. City of Hillsboro, 763 F.3d 1106, 1111 (9th Cir. 2014) (quoting 42 U.S.C. § 12102(2)(A)).

Plaintiff argues that his declaration shows that his depression, anxiety and panic disorder substantially limit some of his major life activities.  In his declaration, plaintiff avers that when he is suffering from one or more of his disorders, he "cannot think clearly, concentrate, interact with other people, sleep, eat, or travel."[52]  Plaintiff also points out that the ADA regulations state that "it should be easily concluded ... that ... major depressive disorder ... substantially limit[s] brain function."  29 C.F.R. § 1630.2(j)(3)(iii).  Thus, plaintiff argues that there is at least a question of fact as to whether his mental impairments substantially limit any of his major life activities.

But, plaintiff's self-serving declaration must be rejected.  "'The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony.'"   Yeager v. Bowlin, 693 F.3d 1076, 1080 (9th Cir. 2012) (quoting Van Asdale v. Int'l Game Tech., 577 F.3d 989, 998 (9th Cir. 2009)).  At his deposition, plaintiff testified that he was able to continue functioning in his life activities during his three prior depressive episodes.  Plaintiff cannot contradict this testimony with a declaration, and contrary to his contention, the questions asked at his deposition were not ambiguous.  Plaintiff was plainly asked if he was able to continue functioning in his life

_____

[52]Stillman Declaration at 3-4, ¶ 15, Exhibit B, Plaintiff's Controverting Statement of Facts [etc.], Docket No. 39.

activities during his first three episodes of depression.  Plaintiff answered that he was and he is bound by the answer.  The evidence also shows that after plaintiff's 2012 panic attack in the Philippines, plaintiff was able to complete a training session and his physician released him to work without restriction only nine days after the panic attack.  Thus, there is no dispute that plaintiff's 2012 mental health issue did not substantially limit any of his major life activities.  While the evidence does suggest that after his termination, plaintiff's depression limited some of his major life activities, evidence of plaintiff's post-termination condition is irrelevant.  Deppe v. United Airlines, 217 F.3d 1262, 1265 (9th Cir. 2000).

In sum, plaintiff's mental impairments did not substantially limit any of his major life activities.  Thus, plaintiff is not disabled for purposes of the ADA.  Because plaintiff is not disabled for purposes of the ADA, defendant is entitled to summary judgment on plaintiff's failure to accommodate and unlawful termination claims.

Plaintiff has also asserted a retaliation claim against defendant.  "To establish a prima facie case of retaliation under the ADA, an employee must show that: (1) he or she engaged in a protected activity; (2) suffered an adverse employment action; and (3) there was a causal link between the two."  Pardi v. Kaiser Foundation Hospitals, 389 F.3d 840, 849 (9th Cir. 2004).  "If the employee establishes a prima facie case, the employee will avoid summary judgment unless the employer offers legitimate reasons for the adverse employment action, whereupon the burden shifts back to the employee to demonstrate a

triable issue of fact as to whether such reasons are pretextual." Id. "A retaliation claim does not necessarily depend on a plaintiff proving that he or she is disabled within the meaning of the ADA." Davis v. Tri-County Metropolitan Transp. Dist. of Oregon, 45 F. Supp. 3d 1222, 1255 (D. Or. 2014).

There is no dispute that plaintiff engaged in protected activity when he requested that he not be required to travel for 30 days because of his disability. There is also no dispute that plaintiff's termination was an adverse employment action. The issue as to plaintiff's prima facie case of retaliation is whether there is a causal link between his request for an accommodation and his termination.

The Ninth Circuit has "recognized ... that, in some cases, causation can be inferred from timing alone where an adverse employment action follows on the heels of protected activity." Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1065 (9th Cir. 2002). Because plaintiff was terminated approximately seventeen days after disclosing his disabilities to his supervisor and requesting an accommodation, a reasonable jury could infer that he was terminated because of his disabilities. Because of the timing in this case, there is at least a question of fact as to causation.

Because plaintiff may be able to make out a prima facie of retaliation, the burden shifts to defendant to articulate a legitimate reason for terminating plaintiff. Defendant has met that burden here. Defendant has stated that plaintiff was terminated because of his

performance issues and because his supervisor no longer trusted him.

Because defendant has articulated a legitimate nondiscriminatory reason for terminating plaintiff, the burden shifts back to plaintiff to show pretext.  To show pretext, plaintiff must demonstrate that "'either ... a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence.'" Id. at 1063 (quoting Chuang v. Univ. of Calif. Davis, Bd. of Trustees, 225 F.3d 1115, 1123 (9th Cir. 2000)).  "A plaintiff may show that an articulated nondiscriminatory reason for discrimination is pretextual either directly or indirectly." Norton v. PHC-Elko, Inc., 46 F. Supp. 3d 1079, 1087 (D. Nev. 2014).  "Direct evidence is evidence 'which, if believed, proves the fact of discriminatory animus without inference or presumption.'" Id. (quoting Coghlan v. Am. Seafoods Co., 413 F.3d 1090, 1095 (9th Cir. 2005)).  "Indirect or circumstantial evidence requires 'an additional inferential step to demonstrate discrimination.'" Id. (quoting Coghlan, 413 F.3d at 1095).  "Since direct evidence is so probative, 'the plaintiff need offer very little' to raise a genuine issue of material fact." Id. (quoting Coghlan, 413 F.3d at 1095).  "On the other hand, when a plaintiff relies on indirect or circumstantial evidence, 'that evidence must be specific and substantial to defeat the employer's motion for summary judgment.'" Id. at 1087-88 (quoting Coghlan, 413 F.3d at 1095).

Plaintiff has come forward with specific and substantial evidence of pretext.  First, there is the temporal proximity between plaintiff asking for an accommodation on July 24,

2012 and his termination seventeen days later.  Temporal proximity may be insufficient by itself to show pretext.  Brooks v. Capistrano Unified School Dist., 1 F. Supp. 3d 1029, 1038 (C.D. Cal. 2014).  But, here, plaintiff has other evidence of pretext beyond temporal proximity.  Although defendant insists that plaintiff was terminated because of he did a poor job with the NBCU training, the class evaluations that plaintiff received from the NCBU training suggest that his performance was acceptable.[53]  Also, the evidence is in dispute as to what extent Smykowski revised the New York training materials, whether she totally revised plaintiff's training materials or whether she simply rearranged some slides.  In addition, Harlan's comment that she did not know plaintiff suffered from depression when she hired him is evidence of pretext.  See Davis v. Team Elec. Co., 520 F.3d 1080, 1092 n.7 (9th Cir. 2008) (stray comments might not be direct evidence of pretext, but they could be circumstantial evidence from which a jury could infer pretext).  Based on all of this evidence, a reasonable jury could conclude that defendant's proffered reason for plaintiff's termination was pretext for discrimination.  Thus, defendant is not entitled to summary judgment on plaintiff's retaliation claim.

Finally, as for plaintiff's claim for declaratory relief in Count II, this claim is

---

[53]Defendant argues that the evaluations are inadmissible hearsay because plaintiff is offering them to prove the truth of the matter asserted.  "At the summary judgment stage, [the court] does not focus on the admissibility of the evidence's form.  [The court] instead focus[es] on the admissibility of its contents."  Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  It is possible that the content of at least some of evaluation forms could be admissible at trial.

dismissed as duplicative.  See Vang Chanthavong v. Aurora Loan Services, Inc., 448 B.R.

789, 803 (E.D. Cal. 2011) (quoting Fimbres v. Chapel Mortg. Corp., No. 09–cv–0886–IED,

2009 WL 4163332, at *5 (S.D. Cal. Nov. 20, 2009) ("'federal court may decline to address a

claim for declaratory relief' where the substantive claims 'would resolve the issues raised

by the declaratory action'").

Conclusion

Defendant's motion for summary judgment[54] is granted in part and denied in part.

The motion is granted as to plaintiff's failure to accommodate, unlawful discharge, and

declaratory judgment claims.  These claims are dismissed with prejudice.  The motion is

denied as to plaintiff's retaliation claim.

DATED at Anchorage, Alaska, this 19th day of April, 2016.

/s/ H. Russel Holland
United States District Judge

---

[54]Docket No. 36.